08 CV 03263

Robert P. LoBue
Hugh J. Freund
Matthew B. Larsen
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
*Attorneys for Plaintiffs Sperone Westwater Inc. and Sperone Westwater Gallery, LLC*

RECEIVED APR 0 1 2008 U.S.D.C. S.D. N.Y. CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SPERONE WESTWATER INC. and SPERONE : Case No. _____
WESTWATER GALLERY, LLC, :
 :
            Plaintiffs, : **COMPLAINT**
 :
    - against - : **JURY TRIAL DEMANDED**
 :
ARCHIVIO ALIGHIERO BOETTI, :
AGATA BOETTI, MATTEO BOETTI and :
ANNEMARIE SAUZEAU, :
 :
            Defendants. :
------------------------------------------------------------x

Plaintiffs Sperone Westwater Inc. and Sperone Westwater Gallery, LLC (collectively, the "Gallery"), through their attorneys Patterson Belknap Webb & Tyler LLP, bring this action against Archivio Alighiero Boetti, Agata Boetti, Matteo Boetti and Annemarie Sauzeau (collectively, the "Defendants") and allege as follows:

### STATEMENT OF THE CASE

1.      Defendant Archivio Alighiero Boetti (the "Archivio") is an Italian organization controlled by certain relatives of the late Italian artist Alighiero Boetti ("Boetti"), who died in 1994. Since the Archivio's creation in 1995, it has held itself out as being expert in all matters concerning the works of Boetti and as the sole authority and source for the issuance of certificates of authenticity for works by Boetti. As a result, the contemporary art market is

1448009v.1

constrained to request, and to accept, its decisions regarding authenticity. The Archivio, however, wants to have it both ways: it has sat on requests for authentication for years without confirming or denying authenticity of works, it has issued and then retracted at least one such certificate for a work sold by the Gallery, it has declared other works inauthentic without good reason, and it has generally impugned the authenticity of Boetti works exhibited and sold by the Gallery and thereby falsely suggested that the Gallery trades in fake works of art. At the same time, the Archivio has claimed that the Gallery has violated the "moral rights" of the Defendants by publishing a catalogue of and exhibiting Boetti works as to which the Archivio without good cause has refused to verify authenticity.

        2. In response to direct threats by the Gallery's counsel of legal action, Defendants brought an action in a court in Milan, Italy, in or about January 2008 (the "Italian Action") against the Gallery and another person seeking, in substantial part, a declaration that present Defendants are not liable to the Gallery for failing to authenticate several works of art attributed to Boetti, and a judgment that the Gallery is liable to them for violating their "moral rights" under Italian law by exhibiting, selling and publishing in New York a catalogue of works attributed to Boetti. Because the Italian Action is obviously a reaction to the Gallery's threats of suit, and because the issues between these parties are governed by United States law that should be decided by a U.S. court, the Gallery has commenced this action (1) for determination that the Defendants have no actionable moral rights to assert against the Gallery, on multiple grounds set forth herein below, (2) for recovery of damages on account of Defendants' issuance of a certificate of authenticity to one Boetti work, and then refusing to stand by it after the Gallery and others had relied on it, and (3) for recovery of damages on account of defendants' negligence, lack of good faith and fair dealing, and interference with business relations in

claiming the sole right to authenticate Boetti works while failing and refusing to issue authentication determinations in a timely and reasonable fashion.

## PARTIES

3. Plaintiff Sperone Westwater Gallery, LLC, is a limited liability company organized under the laws of the State of New York. It is majority-owned by plaintiff Sperone Westwater Inc., a corporation organized under the laws of the State of New York. Sperone Westwater Gallery, LLC, operates the Gallery, and previously during times relevant here Sperone Westwater Inc. operated the Gallery. The Gallery opened in 1975 and is a prominent and highly reputed New York City art gallery that exhibits and sells works of modern and contemporary art. The Gallery deals in the works of such noted artists as Bruce Nauman, Susan Rothenberg, Julian Schnabel, Andy Warhol and William Wegman, as well as Boetti. The Gallery is located at 415 West 13th Street, New York, NY 10014.

4. Defendant Archivio is an Italian entity organized under that nation's laws. It is located at Vicolo della Penitenza 17, 00165 Rome, Italy.

5. Defendant Agata Boetti is Boetti's daughter and Chair of the Archivio's Executive Committee. Upon information and belief, she is a citizen of Italy and maintains a residence at 59, rue de Charonne, 75011 Paris, France.

6. Defendant Matteo Boetti is one of Boetti's sons and a member of the Archivio's Executive Committee. Upon information and belief, he is a citizen of Italy and resides at Via Crescenzio 43, 00195 Rome, Italy.

7. Defendant Annemarie Sauzeau ("Sauzeau") is Boetti's first wife and Director of the Archivio's Executive Committee. Upon information and belief, she is a citizen of Italy and maintains a residence at 9, rue de L'Eperon, 75006 Paris, France.

## JURISDICTION AND VENUE

8.  This Court has jurisdiction over the subject matter of this suit pursuant to: 28 U.S.C. § 1331, because the Gallery's claims arise under the laws of the United States; 28 U.S.C. § 1332, because the parties are of diverse citizenship and the Gallery seeks damages in excess of $75,000; and 28 U.S.C. § 1338, because several of the Gallery's claims arise under the Copyright Act, Title 17 U.S.C., specifically 17 U.S.C. § 106A (the Visual Artists Rights Act of 1990).

9.  In addition, this Court has supplemental jurisdiction over the Gallery's state-law claims pursuant to 28 U.S.C. § 1367 because such claims are part of the same case or controversy alleged with respect to the Gallery's federal claims.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the Gallery's claims occurred in this district.

## BACKGROUND

11. The Gallery has been largely responsible for the recognition of Boetti as a major modern artist whose works now are displayed in museums and are highly valued by collectors. This achievement is largely the work of an owner of the Gallery, Gian Enzo Sperone. Gian Enzo Sperone knew the artist Boetti and his family personally, was among the first to recognize the artistic value of Boetti's works, and encouraged and fostered the artist's career. On behalf of the Gallery and himself, Gian Enzo Sperone acquired a number of Boetti works directly from the artist. Gian Enzo Sperone was one of Boetti's first dealers, and arranged solo exhibitions of Boetti's works as early as 1968 (in Turin, Italy) and on several occasions

thereafter. This association continued until the end of the artist's life in 1994. Gian Enzo Sperone also witnessed Boetti's creative endeavors and has studied Boetti's technique, and is fairly deemed an expert, if not the world's foremost expert, in Boetti's artworks. Gian Enzo Sperone had been asked by the Boetti family to serve as a member of the authentication committee of the Archivio, but declined to do so.

12.     The works in question in this case were executed by Boetti in a "biro" technique, using ball point pens typically to create a dense color field. Part of Boetti's concept and technique was to use assistants who actually applied pen to paper following his instructions. This method was well known and openly acknowledged by the artist and others. Indeed, the artist Boetti signed, and therefore self-authenticated, many of his works that were created in this manner without having touched the pen or paper himself.

13.     Boetti died in 1994. He was survived by his second wife and her son by Boetti, by two other children, defendants Agata and Matteo Boetti, and by his first wife defendant Sauzeau. Agata and Matteo Boetti and defendant Sauzeau formed the Archivio, ostensibly to prepare a *catalogue raisonné* of Boetti's works, and to study and offer objective verification and authentication services regarding Boetti's works. In fact, the Defendants have a significant conflict of interest because, on information and belief, their principal assets are unsold Boetti works. By refusing to authenticate genuine Boetti works owned by third parties, they can attempt to enhance the value of the Boetti works they own by diminishing the number of such works available in the art market.

**The Exhibition**

14.     From January 10 to March 2, 2002, the Gallery held an exhibition, titled *Simmetria Asimmetria*, of 15 Boetti works (the "Exhibition").

15. The Gallery published a catalogue of the works in the Exhibition (the "Catalogue"). The Catalogue was published in and distributed from New York. It included reproductions of all 15 works exhibited by the Gallery in New York.

16. A short essay on Boetti which defendant Sauzeau had written in 2000 was reprinted in the Catalogue. The Gallery paid Sauzeau $300 for permission to reprint the essay. Sauzeau collected her payment from the Gallery in person in January 2002, when she viewed the Exhibition as part of a trip to the United States.

17. In her essay that was included in the Catalogue, defendant Sauzeau acknowledged that Boetti's works were not physically executed by the artist:

> Alighiero Boetti always liked to define himself as a painter even though he gave up oil painting and even the use of the brush at the age of 22. From then on he always "made things" with his hands (or though the intermediary of other peoples' hands). . . . .
>
> Up to now, critics have tended to interpret this work as purely linguistic and conceptual and to some extent esoteric, but always as "cold." All the more so, indeed, because the artist so soon renounced gesture and the physical trace left by his own hand – let us call this "manual subjectivity." He delegated the filling and scribbling to other hands, with which he in fact preferred to avoid direct contact.

18. Ten of the 15 works shown at the Exhibition were supplied by Renato Cardi ("Cardi"), the owner of two galleries in Milan, Italy. Cardi assured the Gallery that the works he provided were genuine Boettis and were registered with the Archivio as such. By agreement with Cardi, the Gallery had an economic interest in the sale of the Boetti works supplied by Cardi.

19. On information and belief, prior to the Exhibition, Cardi sent the Archivio extensive documentation and photographs regarding the Boetti works to be shown at the Exhibition for the purpose of verifying their proper attribution to Boetti. The submission included photocopies of Boetti's signature on several of the works and on photographs of the

1448009v.1

works, indicating Boetti's affirmation that the works were his. As the Gallery later learned, at no time prior to the exhibition did the Archivio issue an opinion as to the attribution of the works submitted by Cardi, and to this day the Archivio has failed to issue its opinion as to the authenticity of several of the works supplied by Cardi. In fact, in a letter from the Archivio to Cardi, the Archivio acknowledged that some materials, such as Cardi's submitted applications, may have been lost when the Archivio moved its offices to a new location.

20.     When the Gallery published the Catalogue in January 2002, it sent a copy to the Archivio. The Archivio subsequently contacted the Gallery, expressing a concern that one of the 15 works in the Catalogue – an untitled piece from Boetti's *Aerei* series executed in 1983 ("*Aerei*") that had been supplied by Cardi – was not an authentic Boetti. A Gallery representative immediately took *Aerei* to Rome for examination at the Archivio, which opined that the work was not authentic. Upon learning of that opinion, and without necessarily agreeing with it, the Gallery immediately withdrew *Aerei* from the Exhibition. At that time, the Archivio did not question the attribution of any of the other Boetti works submitted to the Archivio, even though defendant Sauzeau had an opportunity to examine all of them at the Exhibition, and even though, on information and belief, Cardi had provided the Archivio with documentation as to provenance of all of them well in advance of the Exhibition.

21.     The Gallery subsequently sold nine of the works shown at the Exhibition and reproduced in the Catalogue.

*I sei sensi*

22.     One Boetti work neither shown at the Exhibition nor reproduced in the Catalogue was *I sei sensi*, a piece executed in 1980 in ballpoint pen on paper ("*I sei sensi*").

1448009v.1

23. Cardi consigned *I sei sensi* to the Gallery, which sold it to a private collector in January 2004 for $250,000.

24. As a condition of finalizing the purchase of *I sei sensi*, the collector insisted on being provided with a certificate of the work's authenticity from the Archivio. The Gallery arranged for an Archivio representative, Mr. Andrea Marescalchi, to examine *I sei sensi* in February 2004 at the collector's residence in New York. On March 19, 2004, the Archivio issued a certificate of authenticity for *I sei sensi*, which the Gallery gave to the collector. The Archivio issued the certificate even though, two years earlier, it had denied the authenticity of another Boetti work (*Aerei*) that Cardi had provided to the Gallery.

**The Archivio Widens Its Scheme to Injure the Gallery**

25. In May 2004, the Archivio declared *Unozero*, which the Gallery had shown in the Exhibition and sold in December 2002, not to be a Boetti.

26. In 2006, the Archivio wrote a letter to the Art Institute of Chicago, which had purchased the Boetti work *Alighiero e Boetti* from the Gallery, questioning the authenticity of the work.

27. In 2006, the Archivio refused to stand by the certificate it had issued as to *I sei sensi*'s authenticity. On March 31, 2006, defendant Matteo Boetti wrote a letter on behalf of the Archivio asking the Gallery to ship *I sei sensi* to Rome so that the Archivio could re-examine it in light of alleged "episodes of counterfeited works"—even though the Archivio itself had supposedly detected such a "counterfeit" among the works shown in the 2002 Exhibition two years before it issued the certificate for *I sei sensi*.

28. The Gallery responded by letter dated April 18, 2006, stating that *I sei sensi* was in the collector's possession but the Archivio was free to send a representative to re-

8

1448009v.1

examine the work which it previously had authenticated. To the Gallery's knowledge, the Archivio has not re-examined *I sei sensi*.

29. In March 2006, the Archivio also declared *Salezucchero*, which the Gallery had shown in the Exhibition and sold in June 2002, not to be a Boetti. Without necessarily agreeing with the Archivio, the Gallery subsequently refunded the purchase price to the purchaser and returned the work to Cardi.

30. In January 2008, the Archivio alleged in its complaint filed in the Italian Action that *AELLEIGIACCAIEERROEBIOETITII*, which the Gallery had shown in the Exhibition and sold in February 2002, was of questionable authenticity. The Archivio claimed that it had shared this opinion with Christie's auction house in April 2001. The Archivio made no mention to the Gallery of this upon reviewing the Exhibition Catalogue in January 2002.

31. In addition to *I sei sensi* and the additional works which the Archivio has singled out for aspersion, it now casts doubt over the remaining works shown in the Exhibition that the Gallery obtained from Cardi by stating in its Italian complaint that the purported non-authenticity of *Aerei*, *Unozero* and *Salezucchero*, coupled with the questionable authenticity of *AELLEIGIACCAIEERROEBIOETITII*, "lead[s] one to seriously doubt [] the authenticity of the remaining [] works."

32. Upon information and belief, the Archivio has been telling persons in the art market that the works shown in the Exhibition are of dubious authenticity and that the Gallery deals in inauthentic art.

**The Gallery Threatens Suit**

33. On April 24, 2007, the Gallery's attorneys wrote to counsel for the Archivio, noting the Gallery's "reliance on [the Archivio's] representations and warranties

9

regarding the[] works" shown at the Exhibition and the "Archivio's certification procedures and administration of its responsibilities which were again relied on by [the Gallery] to its detriment [and] loss of profits." The letter also noted "the damage to [the Gallery's] reputation worldwide and attendant loss of income caused by [the Archivio's] actions." The letter finally stated that the Gallery's attorneys had "been authorized to investigate all of the above and to hold [the Archivio] responsible to the extent permitted by law." This letter repeated earlier assertions by the Gallery that it would hold the Defendants legally responsible for their misconduct in reneging on at least one certificate of authenticity and for failing to issue opinions in timely and reasonable fashion as to the several works submitted to them.

**The Italian Action**

34. In January 2008, the Defendants in this case filed the Italian Action in the Tribunale Ordinario di Milano against the Gallery, Cardi and Cardi's gallery. The suit is a classic example of anticipatory litigation, which the Defendants initiated for fear of being sued in the United States and in an attempt to gain the benefit of what for the Gallery is a remote and inconvenient forum and inapplicable Italian law. United States law properly controls the dispute between the parties, and it offers the Defendants no relief.

35. In the Writ of Summons in the Italian Action, which is the equivalent of a complaint, the Defendants allege that the Gallery violated their moral rights in two ways. First, Agata and Matteo Boetti assert, as Boetti's heirs, that the Gallery violated the artist's moral rights by attributing certain works shown in the Exhibition, and reproduced in the Catalogue, to Boetti when in fact such works are not attributable to him. Second, Sauzeau asserts that the Gallery violated her moral rights by including her essay in the Catalogue without informing her of each work to be featured in the Exhibition and Catalogue; she claims that including her essay in the

Catalogue affirmed that she personally endorsed the authenticity of each work, even though her essay did not refer to all of the works featured.

36. In addition to those affirmative claims, in the Italian Action the present Defendants seek a declaration that they owe no liability to the Gallery.

37. Finally, the present Defendants seek a declaration in the Italian Action that four of the works whose authenticity they already have impugned – *Aerei*, *Unozero*, *Salezucchero* and *AELLEIGIACCAIEERROEBIOETITII* – are not Boettis, and ask the Italian tribunal to assess whether the remaining works provided by Cardi actually are Boettis.

## COUNT ONE

### DECLARATORY JUDGMENT
### (Moral Rights of the Archivio, Agata Boetti and Matteo Boetti)

38. The Gallery repeats and re-alleges paragraphs 1 through 37 above as if fully set forth herein.

39. The dispute between the parties concerns events in the United States: the Exhibition was held in New York, the Catalogue was published in New York, the Archivio examined *I sei sensi* in New York, and the other works whose authenticity the Archivio has disparaged were sold in New York. The Gallery is entitled to the protection of United States law for its activities.

40. Congress passed the Visual Artists Rights Act of 1990, P.L. 101-650, § 601 *et seq.* ("VARA") to establish and limit moral rights in the United States. VARA is codified in Title 17 of the United States Code. 17 U.S.C. § 106A. VARA is the exclusive source of U.S. moral rights, and preempts all equivalent rights. 17 U.S.C. § 301(f).

41. VARA potentially protects works of visual art after the death of the artist only if such works were created before June 1, 1991 and the artist did not dispose of title to such

works prior to June 1, 1991. 17 U.S.C. § 106A(d)(2). Otherwise, the rights expire upon the death of the artist. 17 U.S.C. § 106A(d).

42. Upon information and belief, the works at issue here were created before June 1, 1991, but Boetti had disposed of title to them prior to that date. Accordingly, the rights to those works expired when Boetti died in 1994.

43. A real and present controversy exists between the parties because Defendants presently allege that the Gallery has violated their moral rights, and the Gallery denies that claim.

44. The Gallery therefore seeks a declaration that, under United States law applicable to the publication of the Catalogue and the exhibition and sale of the Boetti works in New York, the Archivio, Agata Boetti and Matteo Boetti have no moral rights claims for damages with regard to the Gallery's alleged misattribution of non-Boetti works as Boettis.

## COUNT TWO

## DECLARATORY JUDGMENT
### (Moral Rights of Sauzeau)

45. The Gallery repeats and re-alleges paragraphs 1 through 37 above as if fully set forth herein.

46. By VARA's terms, Sauzeau's essay is not a work of visual art and thus excluded from VARA's protections. 17 U.S.C. § 101.

47. In any event, mere inclusion of the essay in the Catalogue does not affirm on Sauzeau's behalf that all of the works reproduced in the Catalogue are authentic and in no way violates any of her alleged moral rights.

1448009v.1

48. A real and present controversy exists between the parties because defendant Sauzeau presently alleges that the inclusion of her essay in the Catalogue violates her moral rights, and the Gallery denies that claim.

49. The Gallery therefore seeks a declaration that, under United States law applicable to the publication of the Catalogue law, Sauzeau has no moral rights claim for damages with regard to her essay which was reprinted in the Catalogue.

## COUNT THREE

### DECLARATORY JUDGMENT
### (VARA Statute of Limitations)

50. The Gallery repeats and re-alleges paragraphs 1 through 37 above as if fully set forth herein.

51. Claims under VARA are governed by a three-year statute of limitations. 17 U.S.C. § 507(b).

52. The Defendants' moral rights claims are time-barred: the Exhibition was held in 2002, the Catalogue, including Sauzeau's essay, was published in 2002 and the Gallery sold the works at issue here, which the Archivio alleges were misattributed to Boetti, no later than 2004.

53. A real and present controversy exists between the parties because Defendants presently allege that the Gallery has violated their moral rights, and the Gallery denies that claim.

54. The Gallery therefore seeks a declaration that, under United States law applicable to the publication of the Catalogue and the exhibition and sale of the Boetti works in New York, the Defendants have no moral rights claims for damages because any such claims are time-barred.

## COUNT FOUR

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (*I sei sensi*)

55. The Gallery repeats and re-alleges paragraphs 1 through 37 above as if fully set forth herein.

56. In issuing its certificate of authenticity for *I sei sensi* in March 2004, the Archivio knew that the Gallery and its customer would rely on the certificate to confirm and finalize the sale of that work.

57. By issuing the certificate of authenticity, the Defendants expressly represented that *I sei sensi* was authentic and intended the Gallery and its customer to rely on that representation.

58. The Gallery did so rely in good faith upon that representation when it sold *I sei sensi* to the purchaser, which would not have occurred but for the Defendants' representation of authenticity of that work.

59. The Gallery's reliance on the certificate issued by Defendants was reasonable.

60. The Defendants' letter of March 31, 2006, stating that it was "necessary to re-examine" *I sei sensi* in light of "episodes of counterfeited works," effectively withdrew the certificate of authenticity issued on March 19, 2004, thereby putting *I sei sensi*'s authenticity and commercial value in doubt. The Gallery's good-faith reliance on the Archivio's initial representation thus was to the Gallery's detriment, causing unconscionable reputational and economic damages.

61. The Defendants should be estopped from denying, retracting, or otherwise casting doubt on their original representation as to the work's authenticity.

14

62.  The Defendants contracted with the Gallery to examine *I sei sensi* in good faith, with the requisite degree of care. The certificate of authenticity, issued following that examination, properly reflects the fact that *I sei sensi* is an authentic work of Boetti. The Defendants' renunciation of their own certificate of authenticity breached the implied covenant of good faith and fair dealing by undermining the value to the Gallery of the Defendants' performance, causing the Gallery economic and reputational damages.

## COUNT FIVE

### NEGLIGENT MISREPRESENTATION
### (*I sei sensi*)

63.  The Gallery repeats and re-alleges paragraphs 1 through 37 and 56-61 above as if fully set forth herein.

64.  In agreeing to examine *I sei sensi*, the Defendants assumed a duty to perform that examination with the requisite degree of care.

65.  The relationship between the Defendants and the Gallery was such that the Defendants knew that the certificate of authenticity was to be issued for the purpose of securing *I sei sensi*'s marketability, and that the Gallery would rely on the certificate for that purpose. The Defendants claimed to have access to information superior to the Gallery's and assumed a duty to assess the attribution of *I sei sensi* to the Gallery with due care. The Gallery had the right to rely on Defendants' representation and did so reasonably to its detriment.

66.  If *I sei sensi* is not authentic, then the Archivio was negligent in issuing the certificate of authenticity, causing the Gallery reputational and economic damages.

## COUNT SIX

### NEGLIGENT MISREPRESENTATION
### (As to All Works Referred to the Archivio for Authentication)

1448009v.1

67. The Gallery repeats and re-alleges paragraphs 1 through 37 above as if fully set forth herein.

68. In agreeing to examine all of the works submitted by Cardi in 2001, the Defendants assumed a duty to perform that examination with the requisite degree of care.

69. The relationship between the Defendants and the Gallery was such that the Defendants knew that the Gallery would rely on the Archivio to advise it in timely fashion of any question as to the authenticity of the works submitted by Cardi and subsequently exhibited by the Gallery. The Defendants claimed to have access to information superior to the Gallery's and assumed a duty to the Gallery to assess the attribution of those works with due care. The Gallery had the right to rely on Defendants' representations and did so reasonably to its detriment.

70. In viewing both the Exhibition and the Catalogue of the Boetti works (which included all of the works that Cardi had previously submitted to the Archivio for authentication) and choosing to inform the Gallery of a doubt regarding one work's authenticity, the Defendants implicitly represented that they had no doubts concerning the authenticity of the remaining works that had been submitted.

71. The Defendants' duty included the obligation to inform the Gallery of the Defendants' doubt, which they allegedly expressed to Christie's in 2001, concerning the authenticity of *AELLEIGIACCAIEERROEBIOETITII*. The Defendants concealed this material fact from the Gallery, of which the Gallery was unaware. The Gallery relied in good faith on the Defendants' silence in selling the work to its purchaser, which would not have occurred but for the Defendants' silence. Moreover, the Gallery reasonably relied on the Defendants' silence regarding the other works provided by Cardi in selling them to their purchasers, which the Gallery would not have done if the Defendants had indicated that such works were not authentic.

1448009v.1

The Gallery thus relied on the Defendants' silence in good faith to its detriment, causing unconscionable reputational and economic damages.

72. The Defendants should be estopped from denying, disputing, or casting aspersions on the authenticity of the works submitted to them in 2001 for attribution.

73. If the works submitted by Cardi to the Archivio, and subsequently exhibited and sold by the Gallery, are not authentic, then the Archivio was negligent in implicitly representing as of the time of the Exhibition that the works were authentic, and permitting the Gallery to exhibit and sell them, causing the Gallery reputational and economic damages

## COUNT SEVEN

### INTERFERENCE WITH BUSINESS RELATIONS

74. The Gallery repeats and re-alleges paragraphs 1 through 37 above as if fully set forth herein.

75. At all relevant times the Defendants knew that the Gallery was exhibiting and offering for sale specific works of Boetti, that the Gallery was a well-known source of Boetti works, and that the Gallery had opportunities to sell Boetti works to collectors.

76. The Defendants have intentionally interfered with the Gallery's business by willfully, knowingly, and without justification, misrepresenting the works at issue in this case as not being attributable to Boetti, and by retracting and casting doubt on certification previously given by Defendants as to the authenticity of a Boetti work sold by the Gallery.

77. These misrepresentations have already damaged the Gallery in the amount of $29,227.50 (the money the Gallery refunded to *Salezucchero*'s purchaser), and will include any further refunds or lost business attributable to the Defendants' disparagements.

## **RELIEF REQUESTED**

WHEREFORE, the Gallery respectfully requests:

1. Declarations that

    a) the Archivio, Agata Boetti and Matteo Boetti have no moral rights claims under governing United States law with regard to the Gallery's alleged misrepresentation of the works at issue here;

    b) Sauzeau has no moral rights claims under governing United States law with regard to her essay reprinted in the Catalogue;

    c) any moral rights claims under governing United States law which the Defendants might have against the Gallery for the actions described herein are time-barred;

2. Damages for the Defendants' injuries to the Gallery's business and reputation, in an amount to be determined by the finder of fact but in excess of $75,000;

3. An order requiring Defendants to indemnify the Gallery from future damages attributable to the Defendants' wrongful conduct;

4. An order awarding the Gallery attorneys' fees and costs;

5. Such other and further relief as the Court may deem just and proper.

1448009v.1

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury of all issues so triable.

Dated: New York, New York
      April 1, 2008

                                      PATTERSON BELKNAP WEBB & TYLER LLP
                                      1133 Avenue of the Americas
                                      New York, NY 10036
                                      (212) 336-2000
                                      rplobue@pbwt.com

By: _____
                                      Robert P. LoBue
                                      Hugh J. Freund
                                      Matthew B. Larsen

*Attorneys for Plaintiffs Sperone Westwater Inc. and Sperone Westwater Gallery, LLC*

1448009v.1