Hugh J. Freund
Matthew B. Larsen
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
*Attorneys for Plaintiffs Sperone Westwater Inc. and
Sperone Westwater Gallery, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
SPERONE WESTWATER INC. and SPERONE :    No. 08 CV 3263 (RJH) (THK)
WESTWATER GALLERY, LLC, :
:
            Plaintiffs, :    **DECLARATION OF DAVID**
:    **LEIBER IN OPPOSITION TO**
     - against - :    **DEFENDANTS' MOTION TO**
:    **DISMISS THE COMPLAINT**
ARCHIVIO ALIGHIERO BOETTI, :
AGATA BOETTI, MATTEO BOETTI and :
ANNEMARIE SAUZEAU, :
:
            Defendants. :
----------------------------------------------------------x

       I, David Leiber, declare under penalty of perjury that the following is true and correct:

       1.    I am the Director of plaintiff Sperone Westwater Gallery, LLC (together, with plaintiff Sperone Westwater Inc., the "Gallery"), located at 415 West 13th Street, New York, NY 10014. This is the only location at which the Gallery does business. I submit this declaration in opposition to the motion of defendants Archivio Alighiero Boetti (the "Archivio"), Agata Boetti, Matteo Boetti and Annemarie Sauzeau (collectively, "Defendants") to dismiss the complaint in the above-captioned suit.

       2.    I am a resident of New York and have worked at the Gallery since being hired as its Director in January 1989. As Director, I am responsible for the day-to-day operation of the

1964003v.1

Gallery, including coordination of exhibitions and the consignment, purchase and sale of works of art.

3.      The other principals of the Gallery are Gian Enzo Sperone and Angela Westwater. Both are residents of New York, and each of us has information relevant to this case. Each of us works at the Gallery and it would be an inconvenience to travel to the tribunal in Milan, Italy, to attend legal proceedings there.

4.      Many participants in the art market, including auction houses such as Christie's and Sotheby's, recently have come to insist before buying or auctioning a work of modern or contemporary art that the work have a certificate of authenticity. Without such a certificate, a work can be unmarketable. Those who purport to authenticate works of art hold considerable power in the art market and in practice often hold sellers and collectors at their mercy. This power can be abused, thereby damaging the art market, of which New York City is an international capital. Defendants purport to authenticate works of the late Italian artist Alighiero Boetti ("Boetti"). As far as I know, Defendants own several million dollars' worth of Boetti works.

5.      In January 2002, the Gallery mounted an exhibition of 15 "biro" works — pieces rendered in ballpoint pen — by Boetti and published an accompanying catalogue of the works. I oversaw the exhibition and facilitated publication of the catalogue.

6.      Of the 15 works exhibited, 10 were provided by Renato Cardi ("Cardi"), an Italian gallery owner. It was our understanding of our agreement with Cardi that the Gallery acquired a 50% share of each work for an agreed-upon sum and further agreed to split evenly with Cardi the sale price of each work sold.

2

7. We were advised that Cardi had submitted evidence to the Archivio as to the provenance of the works he delivered to the Gallery for exhibition, and such evidence was later provided to the Gallery, including photographs of Boetti's autograph signature on several of the works.

8. I understand that in January 2002, Defendant Annemarie Sauzeau ("Sauzeau"), the Director of the Executive Committee of the Archivio, traveled to the Arts Club of Chicago to view an exhibition of Boetti works there that I had arranged. I also understand that she gave a talk there, for which it would be expected that the Arts Club would have compensated her.

9. Sauzeau then traveled to the Gallery in late January 2002. She had entered into an agreement with the Gallery that gave the Gallery permission to reprint in the exhibition catalogue a 2000 essay of hers, "Monochrome Boetti," in exchange for $300. While at the Gallery, she collected the $300 payment in cash and viewed the Boetti show. The exhibition catalogue, including her essay, was published by the Gallery in New York.

10. I was in the Gallery when she visited, as was Mark Pascale, a curator of prints and drawings at the Art Institute of Chicago. The Art Institute had agreed to purchase *Alighiero e Boetti*, which was in the exhibition, and Mr. Pascale asked that the work be removed from its frame as part of routine due diligence to ensure that there was no damage to the front or back of the piece. The work was removed from its frame and I recall Sauzeau, Mr. Pascale, Ms. Westwater and myself examining it. Sauzeau said she was pleased with the work and pleased that the Art Institute was buying it. The Gallery intends to call Mr. Pascale as a witness in this case.

11. Also while at the Gallery, Sauzeau and I discussed the details of her sale of a Boetti work, *Tutto*, to the Gallery. She explained that she wanted to sell the piece because she

3

was eager to buy an apartment in Rome. A sale price of $600,000 was agreed upon in New York. The Gallery wired the money to Sauzeau and sold the work to a California purchaser for $685,000.

12. Around the time of Sauzeau's visit to the Gallery, the Gallery sent a copy of the exhibition catalogue to the Archivio. This was in keeping with longstanding practice: after Boetti died, the Gallery in 1995 held a solo show of his works for which Defendants asked to be sent the catalogue or list of exhibited pieces. They did the same thing in 2001, when the Gallery held another solo show of Boetti works. They also did the same thing in 1997, 2000 and 2001, when the Gallery featured Boetti works in group shows. The Gallery was in regular contact with Sauzeau during the mid- and late-1990s, trying to arrange for a European retrospective of Boetti works to tour the United States, although such a tour ultimately proved unworkable.

13. Also in the mid-1990s after Boetti died, Agata and Matteo Boetti sold approximately $100,000 worth of Boetti works to the Gallery.

14. To my knowledge, Defendants also have done business with the New York galleries owned by Barbara Gladstone and Larry Gagosian. Indeed, those galleries' websites indicate that they deal in Boettis. See http://www.gladstonegallery.com/boetti.asp; http://www.gagosian.com/artists/alighiero-e-boetti. I would not be surprised if Defendants also sold Boetti works to those galleries.

15. Early in February 2002, I received a call from Sauzeau, who said that Defendants had received the 2002 exhibition catalogue and were concerned that one piece, *Aerei*, did not "look right." She said that Defendants needed to inspect the work in Rome. Rather than endure the delays of an art shipper, I sent a Gallery employee to Rome with the work in hand. Defendants examined it there and, without any explanation, declared it not authentic. I did not

4

1964003v.1

necessarily agree, but I determined that the work would be unmarketable in light of Defendants' opinion and that its presence in the show could undermine, however wrongly, the other works. I therefore immediately removed the work from the exhibition.

16. I specifically recall asking Sauzeau whether Defendants had any concerns about any other works in the exhibition, and I asked her to tell me if they did. Neither she nor the other Defendants expressed any further doubts. This assured me that Defendants had no objections to the exhibition and sale of the other works as authentic Boettis. It was clear to me that Defendants were aware of the Gallery's reliance on them.

17. Of the 14 works remaining in the 2002 exhibition after the removal of *Aerei*, 8 were sold, and 7 of those 8 were sold to U.S. purchasers.

18. Additionally, the Boetti work *I sei sensi*, which was not shown in the exhibition, was sold in 2004 to a U.S. purchaser who insisted upon having a certificate of authenticity for the work. In January 2004, I contacted Sauzeau at the Archivio and conveyed the purchaser's request. She said that the Archivio would need to review photographs of and documentation concerning the work. Sauzeau informed me by email on January 29, 2004, that the Archivio had reviewed such information but could not render a decision. She asked me to provide various photographs of the work, and so I sent her ones I previously had taken of the piece. She responded by email on February 10, 2004, stating that she was "confident about this piece" but needed more information. She emailed me again on February 23, 2004, saying that the Archivio's authentication committee had met again but still was unable to make a decision "even with the improved documentation." She wrote that "Andrea Marescalchi, one of the 3 inner consultants for the Archivio, will be in New York about Feb. 25th for a few days." Sauzeau stated that Mr. Marescalchi had to physically examine the work and report back to the

5

1964003v.1

committee. She said she was "very sorry to insist, we do understand how embarrassing it can be for the gallery." In late February 2004, I accompanied Mr. Marescalchi to the purchaser's residence in New York and observed him physically examine the work. The piece is comprised of 9 panels, and Mr. Marescalchi took several out of the frame and examined each one front and back, taking both notes and photographs. After more than an hour of such examination, he said that he had seen enough and that he thought the work was genuine but that he had to report back to the Archivio. Sauzeau emailed me on March 19, 2004, saying that the Archivio had issued a certificate of authenticity for the work.

19. The Gallery relied on Defendants' certificate of authenticity in completing the sale of *I sei sensi*.

20. I learned of a letter Matteo Boetti sent in June 2004 on behalf of the Archivio to the purchaser of the Boetti work entitled *Unozero*, which the Gallery had sold following the work being shown in the exhibition. The letter stated Defendants' opinion that the work was not attributable to Boetti.

21. In or around March or April 2006, I received a call from the U.S. purchaser of *Salezucchero*, which the Gallery had sold after the work was shown in the 2002 exhibition. The purchaser said that he had tried to sell the work at Christie's auction house in New York but that Christie's had withdrawn the work from the auction after receiving a letter from Matteo Boetti, on behalf of the Archivio, stating that the work was not attributable to Boetti. The Gallery subsequently took the work back and refunded the purchase price of $29,227.50.

22. Matteo Boetti sent a letter to the Gallery on behalf of the Archivio, dated March 31, 2006, concerning *I sei sensi*. The letter states that "it is necessary to re-examine the original work" in light of "episodes of counterfeited works" and "the deeper critical and historical

understanding of the works of Alighiero Boetti." From the Gallery's and art market's perspective, this letter not only effectively revoked the certificate of authenticity that the Archivio had issued for *I sei sensi*, but also put all of Defendants' previously certified works in question. I doubt a leading auction house or other large dealer would be willing to trade in *I sei sensi* given the uncertainty that Defendants have cast over its authenticity. Defendants' conduct harms both the work's purchaser, by making the piece less marketable, and the Gallery, by wrongly suggesting that the Gallery deals in fake works of art.

23. In or around April 2006, I received a call from Mr. Pascale, the curator at the Art Institute of Chicago, which had purchased *Alighiero e Boetti* from the Gallery. He said that the Art Institute had received a letter dated April 5, 2006, that Agata Boetti sent on behalf of the Archivio questioning the authenticity of the work. This is the same work that Sauzeau had personally examined out of its frame at the Gallery in January 2002 and with which she said she was pleased.

24. The Gallery believes strongly that all of the Boetti works it has sold are genuine. But Defendants' reversals of opinion and expressions of doubt concerning previously endorsed works have caused real and substantial damage to the Gallery's business and reputation. For example, between 2000 and early 2004, just before Defendants began impugning the Gallery's Boetti works, the Gallery sold approximately 20 Boetti works, most of which were "biro" works, for over $3 million in total. Since Defendants' disparagements began in 2004, however, the Gallery has been unable to deal in "biro" Boettis due to the cloud that Defendants wrongly have cast over them. I estimate the value of this lost business to be well in excess of $75,000.

25. The current market value of the 10 works whose authenticity Defendants specifically have challenged greatly exceeds $75,000.

26. Following Defendants' reversals of opinion, the Gallery engaged Defendants in negotiations aimed at resolving the dispute without resort to the courts. These negotiations, conducted via the Gallery's Italian counsel, Felice d'Alfonso del Sordo, as well as Mr. Sperone, actively continued through at least late 2007. Defendants' January 2008 suit against the Gallery in Milan, Italy, came as a surprise to the Gallery, which believed that negotiations still were ongoing.

Executed on August 14th, 2008

_____
David Leiber

1964003v.1